**In the Matter of Thomas D. SHOUP d/b/a Thomas D. Shoup Trucking, Debtor.**

**GENERAL ELECTRIC CREDIT CORP., Plaintiff,**

v.

**Thomas D. SHOUP, Great Lakes Energy Systems, formerly Great Lakes Diesel and Henry Ray Pope, III, Esq., Trustee, Defendants.**

**Bankruptcy No. 82–00329. Adv. No. 82–0228.**

United States Bankruptcy Court, W.D. Pennsylvania.

Oct. 24, 1983.

Stanley G. Makoroff and Lampl, Sable & Makoroff, Pittsburgh, Pa., for plaintiff.

James H. Richardson, Jr. and Elderkin, Martin, Kelly, Messina & Zamboldi, Erie, Pa., attorneys for defendants.

## MEMORANDUM AND ORDER

WILLIAM B. WASHABAUGH, Jr., Bankruptcy Judge:

The debtor purchased a 1979 Kenworth tractor on November 19, 1979 for use in his trucking business and financed the transaction by means of a security agreement assigned to G.E. Credit Corporation in the sum of $77,693.28 payable in monthly installments of $1,618.61 beginning January 1, 1980 which was duly perfected as a security interest by notation on the certificate of title for said tractor. Engine trouble developed sometime thereafter and in March, 1982 the tractor was towed to the Great Lakes Energy Systems which reported the engine was beyond repair and would have to be removed and replaced. The period of the warranty of the manufacturer expired the preceding November and the truck had been operated 64,000 miles further than the covered mileage of 200,000, but the manufacturer offered a compromise allowance of $5,371.33 which was accepted and which reduced the additional amount payable for the installation of the required new motor to $8,500.

Great Lakes installed the new motor in the truck, but removed it therefrom when it learned the debtor had filed the instant proceeding in voluntary bankruptcy June 7, 1982, and the testimony that the vehicle has a wholesale value of $26,000 and liquidation value of $20,000 with the motor installed therein, and a wholesale value of $13,000 and liquidation value of $10,000 without such motor was not contradicted.

Great Lakes Energy Systems removed the motor it had installed in the truck when it learned of the bankruptcy filing, and retains its possession under its asserted artisan's lien. The question before us in this action of G.E. Credit Corporation for reclamation of the truck, adequate protection and/or relief from stay, is whether it can retain such possession as against the secured claim of G.E.

Section 9310 of the Pa.U.C.C. (13 Pa.C. S.A. § 9310) is as follows:

"When a person in the ordinary course of his business furnishes services or materials with respect to goods subject to a security interest, a lien upon goods in the possession of such person given by statute or rule of law for such materials or services takes priority over a perfected security interest unless the lien is statutory and the statute expressly provides otherwise."

The law of Pennsylvania on this subject as enunciated in an opinion of Chief Justice Roberts in *Associates Financial Services Co., Inc., v. Odell,* at 491 Pa. 1, 417 A.2d 604 (1980) in affirming a similar holding by the Superior Court of Pennsylvania which reversed a contrary holding of the Court of Common Pleas of Butler County, is clearly that an artisan's common law lien for services performed on property subject to a security interest is enforcible in priority to an underlying secured claim only if

the holder thereof consents thereto. See also *Associates Commercial Corp. v. Bergey's G.M.C. Inc.*, 19 B.R. 6 (Bkrtcy.E.D.Pa. 1982, Goldhaber, J.) reaching the conclusion that the Chief Justice's opinion concurred in by a majority of the Supreme Court is binding on the federal courts.

The law of Ohio in which the plaintiff's garage to which the vehicle was towed for the necessary repairs similarly recognizes priority rights of the underlying lienor: *Commonwealth Loan Co. v. Berry*, 2 Ohio St.2d 169, 207 N.E.2d 545 (1965); *Commonwealth Loan Co. v. Downtown Lincoln Mercury Co.*, 4 Ohio App.2d 4, 211 N.E.2d 57 (1964).

The record is clear that a representative of G.E.C.C. called Great Lakes Energy Systems on the telephone to ascertain whether the vehicle was in its possession without mentioning the existence of its security interest thereagainst before the making of the repairs, but it is equally clear that Mr. Duke, the service manager of Great Lakes who responded to the call, made no inquiry as to the reason it was made, or whether G.E.C.C. had a lien on the vehicle or desired or consented to the ordered repairs being made. It is also clear that the debtor had frequently had extensive repairs made by Great Lakes to its vehicles in the past and that they were uniformly paid for in due course; that said Great Lakes was content to look to said debtor for payment for the instant repairs and in the alternative to rely on its claimed right to retain possession of the vehicle under its possessory lien until payment was obtained; that it was wholly indifferent and unconcerned as to whether there was an underlying lien of G.E.C.C. or any other financing institution thereagainst under the testimony of its service manager, Richard L. Duke (from pages 56 & 57):

"Q. All right. Did Mr. Shoup at that point tell you anything about General Electric?

"A. No. I knew he had it financed, but—

"Q. You did know he had it financed?

"A. Yes.

"Q. So, at the time you planned to make the repairs you were aware that the truck had been financed, is that correct?

"A. Yes."

. . . . .

(from page 58):

"Q. And you assumed that the value you could get for the truck was far in excess of what he owed you?

"A. I did not want the truck.

"Q. I know.

"A. The only thing that I was interested in, even if I repaired or put the engine in, was the engine. We are a distributor for Detroit Diesel and we do not deal in trucks. We have no—

"Q. All right. Now, when you received the call from General Electric, did he identify—did you ask him his interest, why he was interested in Mr. Shoup's truck?

"A. No. He just indicated to me that he wanted to know when the truck left."

. . . . .

(from page 59):

"Q. And did he ask you what repairs were being made?

"A. He asked me what we were doing to it and I said we were installing a new engine.

"Q. All right. Now, at that point did you ask him if it was all right to make these repairs?

"A. I didn't know he had the loan on the truck.

"Q. All right. So, during that conversation on the 23rd you asked for no consent from General Electric, is that your testimony?

"A. At this point I knew Mr. Shoup was needing financing and I assumed that he was going to General Electric to get the money.

"Q. All right. But, you made no inquiry as to whether they were going to give it to him, or if it was all right for you to go ahead and make the repairs?

"A. No, I didn't.

"Q. All right. And the only thing he asked you is to let you know before you released the truck?

"A. Yes, he wanted to know when the truck left."

.    .    .    .    .

(from page 60):

"Q. All right. Now, once again, you were not seeking their approval to do these repairs on the 23rd?

"A. As far as I knew, Mr. Shoup owned the truck.

"Q. So, you didn't care whether G.E. wanted you or didn't want you, that was immaterial to you?

"A. Uh-huh.

"Q. As far as you were concerned, you were being paid by Mr. Shoup?

"A. Right."

.    .    .    .    .

(from pages 63 & 64):

"Q. All right. Now, did you know Mr. Shoup at all?

"A. We had done business with him previously.

"Q. You had? He was a customer of yours?

"A. He was a cash customer of ours, but we have several customers that way. He was a previous customer.

"Q. All right. But, you did do business with him in the past?

"A. Yes.

"Q. And did you have any trouble collecting the account in the past?

"A. No, we didn't.

"Q. So, he paid you what his bill was without any problem?

"A. Correct.

"Q. You had every reason to believe he would again pay you on this one, is that correct?

"A. Correct.

"Q. And you, of course, were not looking to anyone else but Mr. Shoup to pay you?

"A. Correct."

■ It is obvious that Great Lakes Energy Systems obtained no artisan's lien enti-

tled to priority over the underlying lien of General Electric Credit Corporation under the law of Pennsylvania as enunciated by Chief Justice Roberts in *Associates Financial Services Co., Inc. v. Odell,* supra, as it did not obtain G.E.'s consent to the making of the repairs and made no effort to ascertain whether it had an underlying lien by inquiry to its officer who called to verify the whereabouts of the tractor before the repairs were made or otherwise; this, even though he knew it was going to G.E.C.C. for the necessary financing (page 59, quoted supra).

■ The absence of priority status of Great Lakes is comparable to the plight of a seller of inventory who is given a right to obtain precedence over underlying liens by perfecting a purchase money security interest thereagainst and giving notice thereof to such lienor before delivery and installation of the sold articles by the provisions of 13 Pa.C.S.A. 9312(c)(2) and fails to give such notice: *Bigelow-Sanford, Inc. v. Security-Peoples Trust Co.,* 304 Pa.Super. 167, 450 A.2d 154 (1982). The repairman had the tractor in his custody for the limited purpose of making repairs thereto in which

"As between the parties to the sale, title passes when the goods are identified to the contract and the seller completes his contractual obligations with respect thereto. See code § 2–401(1) and (2). Under those provisions, plaintiff acquired title to the collateral purchased from defendants, without repossession thereof": *Spickle v. Lombardo,* 25 UCC Rep 1500, 1517, 36 Somerset L.J. 44 (Pa.1978).

As title to the engine passed to the debtor April 30, 1982 when the repairman installed it in the vehicle under 13 Pa.C.S.A. § 2401(2) which provides for such result "at the time and place at which the seller completes his performance with reference to the physical delivery of the goods" prior to the filing of the reorganization proceeding June 7, 1982, Great Lakes was in violation of the automatic stay provisions of 11 U.S.C. § 362 when it removed the new engine from the vehicle and will be required to make restoration of the status quo.

IT IS ORDERED, ADJUDGED and DE-CREED for the foregoing reasons that the defendant, Great Lakes Energy Systems, shall reinstall the subject new engine or its equivalent in the tractor and deliver it in satisfactory condition to General Electric Credit Corporation forthwith, or in the alternative, deliver the tractor in satisfactory condition without the new motor installed therein and pay General Electric Credit Corporation the sum of $8,500 with interest thereon at the rate of 10% per annum from November 8, 1982, judgment for which will be entered on submission of an appropriate order and motion therefor unless the first alternative has been complied with twenty (20) days prior thereto.

IT IS FURTHER ORDERED that the time for appeal shall be extended to a period of ten (10) days from the date of this revised Order October 24, 1983 rather than from the date of the original Order, October 21, 1983.