**In re Sanders J. RUSSELL, Nellie G. Russell, Debtors.**

**Sanders J. Russell, et ux., Plaintiffs,**

**v.**

**Mountain National Bank, et al., Defendants.**

**Bankruptcy No. 7–97–03333–WSA–7. Adversary No. 7–97–00283.**

United States Bankruptcy Court, W.D. Virginia, Abingdon Division.

Feb. 1, 2000.

---

John M. Lamie, Browning, Lamie & Sharp, P.C., Abingdon, VA, for Sanders J. & Nellie G. Russell.

Howard J. Beck, Jr., Gentry, Locke, Rakes & Moore, Roanoke, VA, John L. Gregory, III, Young, Haskins, Mann, Gregory & Smith, Martinsville, VA, for Mountain National Bank.

William E. Callahan, Jr., King, Higgs & Callahan, Roanoke, VA, Trustee for Debtor.

### *MEMORANDUM OPINION*

WILLIAM F. STONE, Jr., Bankruptcy Judge.

This adversary proceeding presents the conflict between Mountain National Bank's ("the bank") blanket security interest upon the property, including inventory, of the debtors' retail furniture store known as Triangle Discount Furniture and the rights of five purported consignors of furniture placed in that store for sale by the debtors. The debtors joined as defendants the bank and the five alleged consignors and sought a determination by this Court that the bank's security interest did not constitute a lien upon the goods owned by the consignors. Only the bank of all six defendants has filed an answer or otherwise participated in this proceeding, but it has not filed any cross-claim against the other defendants. The debtors have sought to protect in this proceeding the interests of the asserted consignors without whom the store apparently would have effectively ceased operations long before it actually did.

The debtors originally filed a Chapter 13 petition on August 22, 1997 but were unable to propose a plan which was confirmed by this Court. At a hearing held before this Court on December 20, 1999 at which the debtors' Third Modified Plan was denied confirmation, the Court granted the bank's motion to convert the case to one under Chapter 7.

Neither the Chapter 13 Trustee nor the Chapter 7 Trustee has been made a party to this proceeding and accordingly the rights of the bankruptcy estate vis-a-vis the bank and the consignors could not be adjudicated in this proceeding.

An evidentiary hearing was held before the undersigned judge's predecessor on May 5, 1998 and counsel for the debtors and the bank thereafter filed documentary exhibits and submitted written arguments in support of their respective positions. The Court took the matter under advisement in connection with a separate adversary proceeding involving the bank and the debtors. Counsel have agreed, however, that this proceeding stands on its own and is ready for decision. Although the undersigned judge did not preside at the hearing, Sanders Russell was the only witness and neither his testimony nor his credibility was seriously challenged by the bank in that hearing. The areas of disagreement between the parties principally relate to the legal consequences of undisputed facts.

The issues raised by the parties may be summarized as follows:

1. Whether the consignors' rights, whatever they may be, have been forfeited by their failure to participate in this proceeding?

2. Whether the consignment agreements are actually security agreements for money lent to the debtors to finance the continued operation of their store?

3. Whether the wording of the bank's security agreement and financing statements was sufficient to create a security interest in the furniture owned or financed by the consignors?

4. Whether the action of one of the consignors, Maurice Vaughn Furniture Company, in filing a financing statement for its furniture was sufficient to protect its rights against the bank even if the other consignors lose theirs?

5. Whether actual knowledge by responsible bank officials of the consignment arrangements made by the debtors with the consignors and its acquiescence in those arrangements precludes the bank from enforcing its security interest against the furniture financed or owned by the consignors if the latter failed to take all steps ordinarily necessary under applicable Virginia statutes to protect their rights?

### Findings of Fact

On June 20, 1992 the debtors obtained a loan from the bank (then Patrick Henry National Bank) in the amount of $330,000 and executed a note in such amount payable to the order of the bank and secured by a credit line deed of trust upon four tracts of real property, including improvements, and a security agreement against the assets of the furniture store (Triangle Discount Furniture). The security interest was properly perfected by duly filed financing statements and this perfection was continued by timely filed continuation statements. As relevant to this proceeding the collateral subject to the security agreement and financing statements was stated to be

> all the debtors' ... inventory, ... furniture and fixtures, ... whether now owned or hereafter acquired or the proceeds thereof, associated with the property located at Highway 100 in Carroll County, Virginia and the rental property in the old B. and L. Chevrolet Company in the Towne of Hillsville and in the business known as Triangle Discount Furniture and owned and operated by Sanders J. Russell and Nellie C. Russell.

The factual and legal situations of the five alleged consignors are not identical.

Maurice Vaughn Furniture Company was a distributor of furniture in its own right and placed items of its furniture line or lines with Triangle Discount Furniture. In addition, it had its own attorney prepare a consignment agreement which provided that Triangle Discount Furniture could sell the consigned items at any prices it desired so long as they were at least the minimum price set by the consignor. In other words, the consignee could keep any profit it made in excess of the prices set by the consignor. Furthermore, Maurice Vaughn Furniture Company duly filed financing statements in the Circuit Court of Carroll County and the State Corporation Commission of Virginia to perfect its rights pursuant to Va.Code § 8.2–326(c)(3).

The other consignors were not in the furniture business but each of them entered into an agreement with Russell providing that he or she would provide the funds necessary to purchase items of furniture from a designated manufacturer or from a designated line of furniture. The designated manufacturer or designated line of furniture would be different from that purchased by any other consignor and from any furniture lines handled by Triangle Discount Furniture as a part of the debtor's own inventory. Mr. Russell arranged for an attorney to prepare a consignment agreement form which was used for each of these four other consignors. No financing statements were filed on behalf of any of these consignors. According to testimony by Russell, the attorney who prepared the agreement form told him that because each of these consignors was an individual rather than a corporation, no financing statement was necessary to protect their respective interests.

According to the evidence before the Court, each item of consigned furniture was posted with a tag containing the initials "TDC", standing for "Triangle Discount Consignment," and containing a number which identified the specific consignor having provided or paid for the item of furniture in question. When an item of consigned furniture was sold, the proceeds were placed in the store's general account and remitted to the consignor upon request or in accordance with any remittance schedule which had been established between that consignor and Mr. Russell.

There was no evidence that any consignor gave written notice to the bank that it was supplying furniture to Triangle Discount Furniture on a consignment basis.

Mr. Russell testified at the hearing as follows concerning the bank's knowledge of those consignment arrangements:

Q. Now, did the Bank....the Patrick Henry Bank have any knowledge of how you were operating?

A. Other than....Mr. Carl Davis and I talked about it on three or four occasions. I would partial consignment back when I first started. And he and I both....he agreed with me that a full consignment was what I was going to have to do to maintain an inventory.

Q. When did you talk to Mr. Carl Davis?

A. In 1996 and....early 1996. We had....we started planning just after December 1996 for the requested foreclosure proceeding.

Q. Are you talking about December of 1996, or are you talking about a year earlier?

A. We sold it in June of 1996, I think.

Q. So December of 1995? Is that the date you are talking about? You said before December of 1996.

A. No, it was....it was before the foreclosure. We had about four months of negotiating what to do on the foreclosure.

Q. And during that period of time who did you negotiate with?

A. Carl Davis.

Q. And at that time was he an officer of the Bank?

A. He was an officer, I think, over three banks. He was a senior officer.

Q. Do you know what title he had, or anything like that?

A. No, sir, I don't.

Q. What information did you give to him concerning that the consignments?

A. That my inventory was down. I wasn't selling enough to keep my payments on the property up. And we needed to sell free items. I gave him the same information. He and I both discussed about the consignments.

Q. And what did he say about your consignment arrangement?

A. He never said anything, "yea" or "nay". No disapproval nor approval. He just listened and accepted what I had said. But now, Mr. Shockley at the time of the deed of trust, I offered him a chance for consignment. He declined because it could be, he said, a conflict of interest. But he did go tell Mr. Davis at that time that that is what I was going to do.

MR. BECK: Your Honor, I don't think that Mr. Russell knows that, that Mr. Shockley told Mr. Davis anything.

THE COURT: That probably would not be admissible.

MR. LAMIE: Well, let me ask him.

Q. Do you have a basis for . . . . did Mr. Shockley make a statement to you to that effect, that he had told Mr. Davis?

A. Yes.

Q. He made that statement to you?

A. He made that statement.

Q. When did he make that statement to you?

A. Before he retired. Before he left the Bank.

Q. Was Mr. Shockley there at the same time that Mr. Davis was?

A. At the early part. Mr. Shockley was the Branch Manager in Hillsville, and Mr. Davis, I think, correlated the three banks together.

Q. When did you have a conversation with Mr. Shockley about his getting involved?

A. Probably in 1993. Probably in 1993.

Transcript pp. 23–25.

No evidence was offered that any bank representative made any representation either to its customer or any of the consignors that the bank would subordinate its rights under its security agreement or that the consignors did not need to take actions otherwise required by law to protect their interests. Accordingly, the Court finds that the bank was aware of and had actual knowledge that its customer was utilizing consignment arrangements to maintain a respectable store inventory and acquiesced in such arrangements but that it did not engage in any other conduct which promoted these arrangements or otherwise would have lulled the consignors to fail to protect themselves.

The Court further finds that the bank did not advance any loan funds in reliance upon the consignors' furniture. Indeed the reason that the Russells initiated the consignment arrangements was that all of the debtors' cash flow was needed to make the regular loan payments to the bank and it was unwilling to make any additional advances to them. Therefore, the bank was clearly benefitted by the addition of the consignors' furniture to its customer's inventory and would receive a "windfall" if its security agreement captures such furniture.

While the Court finds that the bank knew of the consignment arrangements, no evidence was offered that Triangle Discount Furniture's creditors generally were aware that it was engaged in selling consignment goods. The debtors' bankruptcy schedules reflect that they had in excess of thirty creditors at the time they filed their petition.

### Conclusions of Law

■ Issue # 1: Whether the consignors' rights, whatever they may be, have

been forfeited by their failure to participate in this proceeding? The complaint which initiated this proceeding sought a determination that the bank's security interest did not attach to the consignors' furniture. The relief sought was favorable to the consignors and no relief against them was requested. Accordingly, their failure to appear and participate cannot by itself result in an adverse determination against them. While a default may result in the relief sought against the defaulting party being granted, it cannot properly result in relief more extensive than that demanded in the pleading which has been served upon such party.

■ Issue # 2: Whether the consignment agreements are actually security agreements for money lent to the debtors to finance the continued operation of their store? While the arrangements with the consignors other than Maurice Vaughn Furniture Company have some characteristics of a financing operation rather than a true consignment, under the facts of this proceeding it makes no difference in which way they are characterized. In the absence of evidence that the debtors were generally known by their creditors to be engaged in selling consignment goods, the initial step necessary for the consignors to protect themselves, the filing in the correct offices of a sufficient UCC financing statement, was the same as would be required if they were purchase money inventory financiers. Va.Code § 8.2–326. Therefore, there is no need to decide whether these arrangements are true consignments.

The remaining issues for decision necessarily implicate the interests of the Chapter 7 Trustee.

■ The Court has concluded that it should not render a decision purporting to adjudicate the rights of the consignors vis-a-vis the bank without the joinder of the bankruptcy trustee as a party to this adversary proceeding. If this Court were to decide in favor of either the bank or the consignors, particularly as to the four consignors who did not file any financing statements to give any public notice of their arrangements with the debtors, it could well be faced with having to revisit these same issues at the instance of the Chapter 7 Trustee. The evidence before the Court is that all of the consignors' unsold furniture was located on the store premises at the time of the debtors' filing.

Because Virginia no longer has a consignment "sign" law and no evidence was presented that the debtors' creditors generally were aware that the debtors were engaged in selling furniture on consignment, under Va.Code § 8.2–326 the consignors were bound to file financing statements in order to prevent their property from becoming subject to the claims of their consignee's creditors. It is clear that the rights of the bankruptcy trustee would not be affected by any knowledge or asserted inequitable conduct on the part of the bank. Accordingly, in the absence of the trustee the Court is not able to make a final and binding determination of the rights of the parties in this furniture. *See In re Marcoly,* 32 B.R. 423, 424 (Bankr. W.D.Pa.1983); *In the Matter of High–Line Aviation, Inc.,* 149 B.R. 730, 738 (Bankr. N.D.Ga.1992).

While it appears that the position of Maurice Vaughn Furniture Company, which was the only consignor to file UCC financing statements, is probably valid against the bankruptcy trustee and that its real contest is with the bank upon the latter's prior filed financing statements to be determined under the priority rules of Va.Code § 8.9–114, subject to arguments on the possible application of equitable estoppel and unjust enrichment principles, the Court concludes that the possibility that the Trustee might assert a claim against Vaughn's furniture is sufficient reason to decline to rule on the issue in the absence of the Trustee as a party to this proceeding.

In the absence of the Chapter 7 Trustee, the operations of Triangle Discount Furni-

ture having long ceased and the debtors claiming no interest in the consignors' furniture, there would be no strong basis in the Court's view for it to decide a controversy between non-debtors, the outcome of which would be controlled by Virginia law, and that it would be preferable were the Trustee not added for this Court to abstain from hearing the proceeding in favor of the Virginia court in which actions brought by the bank against the consignors have been pending asserting the same claims against the consignors which it seeks to assert here.

An order shall be issued contemporaneously with this Memorandum Opinion adding the Chapter 7 Trustee as a party defendant to this proceeding and directing that he file such pleadings as he may be advised within thirty (30) days of the entry of such order.